UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 3:21-CR-00171-1 |
| | ) | JUDGE RICHARDSON |
| [1] FADEL ALSHALABI | ) | |

**POSITION OF THE UNITED STATES ON PRESENTENCE REPORT**

The United States of America, by and through Assistant United States Attorneys Sarah K. Bogni and Robert S. Levine, submits the position of the United States in this case with respect to the Presentence Investigation Report, prepared on January 31, 2025, and revised on June 18, 2025 ("PSR"). The PSR calculates a Total Offense Level of 39. The United States has one objection to the calculation of the offense level in the PSR—to paragraphs 83 and 92—and submits that the correct Total Offense Level is 41. With a Total Offense Level of 41 and a Criminal History Category of I, the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") recommends a term of imprisonment of 324 to 405 months and a fine range of $50,000 to $1,403,098.04.[1] If the Court were to sustain the United States' objections to the PSR, paragraphs 92, 130, as well as the information on page 49 of the PSR will need to be revised.

I. *Objection 1 – Paragraph 83(b)*

The Guidelines recommend the application of Section 2S1.1(a)(1) for money laundering. The Guidelines then recommend application of the offense level for the underlying offense from which the laundered funds were derived. Here, the PSR recommends Section 2B4.1 for a violation

---

[1] The Guidelines recommend a maximum fine of $500,000, but that maximum does not apply where a statute authorizes a maximum fine greater than $500,000. *See* U.S.S.G. §§ 5E1.2(c)(2)-(4). Title 18, United States Code, Section 1957 allows a court to impose an alternate fine of not more than twice the amount of the criminally derived property involved in the transaction.

of the Anti-Kickback Statute ("AKS") *See* PSR ¶ 82-83. The United States does not dispute that these are the appropriate Guidelines to apply.[2] However, the United States objects to the PSR's determination that the value of the improper benefit to be conferred[3] is $35,609,979.20, the amount paid by Medicare, Medicaid, and United Healthcare to Crestar[4] as a result of the defendant's payment to marketing companies for referrals. *See* PSR ¶ 72. Instead, the United States submits that the value of the improper benefit to be conferred should be $129,736,488.54, the amount billed to Medicare, Medicaid, and United Healthcare because of referrals purchased by defendant. *See* PSR ¶ 72. This amount was the improper benefit Crestar stood to gain, because of defendant's payment of kickbacks. Given that $129,736,488.54 is more than $65,000,000, but not more than $150,000,000, the base offense level should be increased by 24 levels, not 22 levels, and the base offense level pursuant to U.S.S.G. § 2S1.1(a) should be 32, not 30. *Cf.* PSR ¶ 82(b).

The United States reaches the conclusion that the value of the improper benefit to be conferred is the amount billed to Medicare for genetic tests induced by kickbacks in two,

---

[2] The Guidelines recommend Section 2B4.1 or Section 2B1.1 for violations of the AKS.

[3] Section 2B4.1 requires the Court to determine the "the value of the bribe [or kickback]" and the value of "the improper benefit to be conferred [in exchange for the kickback]." U.S.S.G. § 2B4.1(b)(1). The Court must then take the greater of those two numbers and apply it to the loss table in Section 2B1.1(b)(1). *Id.* Here, the total amount of kickbacks involved in the conspiracy to pay and receive kickbacks is $12,031,057.60. PSR ¶ 73. The amount of the kickback is less than the value of the benefit to be conferred as calculated by the PSR and as argued by the United States herein, so the amount of the benefit to be conferred should be used to calculate the increase to the offense level under Section 2B4.1(b)(1).

[4] "Crestar," as defined herein, includes the three laboratories under the Crestar umbrella: Crestar Labs LLC (Crestar Tennessee), Karemore Labs (Crestar Labs Maryland), and Martis Analytics and Diagnostics LLC (Crestar Texas). For purposes of this position statement, "Crestar" also includes Advanta Labs LLC, the name the subsequent laboratory in Texas (located in the prior Martis space after Medicare revoked the ability of Martis to bill Medicare) and initially owned by the defendant, and later sold to nominee owners he controlled until on or about September 2021. All four labs were purchased through a holding company called Stars Holding LLC, of which the defendant was the sole member. The defendant enrolled each lab in Medicare and signed the enrollments as the "owner" of the labs.

independent ways. First, the principles of Section 2B4.1, including application of associated commentary to those Guideline provisions and other, cross-referenced Guideline provisions, suggests that the value of the improper benefit conferred is the same as the intended loss under Section 2B1.1. Second, the best interpretation of Section 2B4.1, in isolation, is that the value of the improper benefit to be conferred is the amount a confederate stood to gain, which, in this case, would be the amount Crestar billed for genetic tests procured through the payment of kickbacks to marketers.[5] Additionally, regardless of how the Court determines the value of the benefit conferred, that value should not be offset or reduced by any amount because the entirety of Crestar's business was focused on improperly billing medically unnecessary laboratory tests and the testing itself was unreliable.

    A. The Value Of The Improper Benefit To Be Conferred Should Be The Amount Of Intended Loss Under U.S.S.G. § 2B1.1.

The "value of the improper benefit to be conferred refers to the value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 cmt. n.2 (citing commentary to § 2C1.1). Under § 2C1.1, "the value of the benefit received or to be received means the net value of such benefit." U.S.S.G. § 2C1.1 cmt. n.3. In a health care bribery case involving Medicare (Part B and Part C plans), the amount of the claims submitted to the payor is the "improper benefit to be conferred" because it is the money that was expected to be received from the offense. *See, e.g.*, *Angarita v. United States*, No. 09-20015-CIV, 07-20669-CR, 2010 WL 2872821, at *19-20 (S.D.

---

[5] The United States acknowledges that, in related cases, the Court, over the United States' objection, determined that the value of the benefit conferred was the amount that Crestar collected as a result of referrals. *See United States v. Toh*, Case No. 3:22-cr-00392 (doctor who signed orders for kickbacks); *see also United States v. Harris*, Case No. 3:21-cr-00171-8 (amount Crestar collected based on referrals from marketer co-defendant). The United States respectfully maintains that the correct value of the improper benefit conferred is the amount that Crestar could bill as a result of the referrals induced by kickbacks. For that reason, and to preserve its position in this matter, the United States repeats some of its arguments here.

Fla. May 24, 2010) (stating that "an analysis of the cross-references contained in [§ 2B4.1] leads to the conclusion that 'intended loss' and 'improper benefit' are calculated in the same way"); *see also United States v. Gonzalez*, 524 F. App'x 557, 565 (11th Cir. 2013) (not plain error for sentencing court to calculate loss under §§ 2B4.1(b) and 2B1.1(b)(1) based on intended loss to Medicare and the Medicaid plan sponsors); *United States v. Aenlle*, 327 F. App'x 152, 153-154 & note 1 (11th Cir. 2009) (not error for sentencing court to calculate loss under § 2B4.1(b) based on false claims directly submitted to Medicare); *United States v. Berenguer*, 299 F. App'x 915, 919 (11th Cir. 2008) (finding no error where court used "submitted claims" to Medicare as value of improper benefit to be conferred where defendants convicted of conspiracy to violate the AKS); *United States v. Osemwengie*, No. 23-20511, 2024 WL 1929020, at *1 (5th Cir. May 2, 2024) (affirming use of amount billed to Medicare).

Other courts have concluded that the value of the action to be taken or effected in return for the bribe is calculated based on the amount paid by the federal health care programs as opposed to the amount billed. *See United States v. Job*, 387 F. App'x 445, 457-58 (5th Cir. 2010) (rejecting the argument that because the defendant was convicted of AKS violations but not of health care fraud, the district court erred by deeming the improper benefit under § 2B4.1 to be the amount fraudulently obtained from Medicare); *United States v. Nerey*, 877 F.3d 956, 977-78 (11th Cir. 2017) (finding no clear error where district court found the value conferred was amount paid by Medicare and finding entire amount of conspiracy applied); *United States v. Gonzalez*, 566 F. App'x 898, 901-02 (11th Cir. 2014) (using amount paid by Medicare); *United States v. Kallen-Zury*, 629 F. App'x 894, 913-14 (11th Cir. 2015) (finding amount paid by Medicare to be the benefit conferred and attributing relevant conduct to include losses by co-conspirators). Other

4

courts have disagreed with either approach in AKS cases. *See United States v. Yielding*, 657 F.3d 688, 716-17 (8th Cir. 2011) (applying the value of the kickback received).

The defendant should be held responsible for the amount in billed claims given the cross reference from Section 2B4.1 to Section 2C1.1. In a conspiracy like this one, the actions to be taken or effected as a result of the conspiratorial chain of illegal kickbacks and bribes is the ability to bill federal health care programs. The very purpose of the AKS is "to prevent the perversion of incentives, to ensure that actors, such as those in the health field, act for the proper reasons, to avoid a conflict of interest when it comes to the exercise of medical judgment." *United States v. Howard*, 28 F.4th 180, 207 (11th Cir. 2022). Thus, it makes sense that, unlike traditional commercial bribery offenses, the Guidelines treat health-care-related-bribery crimes differently. In Appendix A, the Guidelines recommend the application of Section 2B1.1 *or* 2B4.1 for health care bribery crimes like the AKS and Eliminating Kickbacks in Recovery Act (18 U.S.C. § 220), but they only recommend Section 2B4.1 for traditional commercial bribery statutes (that do not involve public officials), like 18 U.S.C. § 215 and 18 U.S.C. § 224. In paying and receiving health care kickbacks, the whole intent of the crime is to improperly induce referrals that will result in the ability to bill federal health care programs. That is the benefit to be conferred.

Section 2B1.1 also explicitly treats "loss" in federal health care offenses differently than other offenses. Section 2B1.1(b)(C) states that a defendant must be held responsible for all "reasonably foreseeable pecuniary harm." *See* U.S.S.G. § 2B1.1(b)(1)(C) ("Actual Loss").[6] "'Reasonably Foreseeable Pecuniary Harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

---

[6] Previously defined in the application notes, the definition of actual and intended loss is now in the Guideline itself as of the November 1, 2024, revisions to the U.S.S.G. This revision reflects the intent to apply the full scope of intended loss, including in federal health care offenses.

5

offense." *Id.* Intended Loss is defined as the "pecuniary harm that the defendant purposefully sought to inflict; and [] includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* In other words, intended loss refers to the actions to be taken or effected as a result of the chain of kickbacks and bribes, or *the improper benefit to be conferred*. Application Note 3(E)(viii) to Section 2B1.1 further explains that, "[i]n a case in which the defendant is convicted of a federal health care offense involving a government health care program, the aggregate dollar amount of fraudulent bills submitted to the government health care program shall constitute *prima facie* evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted."[7] U.S.S.G. § 2B1.1 cmt. n.3(E)(viii). The AKS and a Section 371 conspiracy involving a health care benefit program are "federal health care offense[s]" as defined in 18 U.S.C. § 24 and referenced in Application Note 1 to Section 2B1.1. Thus, for a "federal health care offense" like a conspiracy to violate the AKS, the improper benefit conferred under § 2B4.1 is equivalent to the amount of the intended loss under § 2B1.1. Here, that amount is $129,736,488.54. PSR ¶ 72.

> B. The Value Of The Improper Benefit To Be Conferred Under U.S.S.G. § 2B4.1 Is The Amount Crestar Billed On Genetic Tests It Procured through Kickbacks Because That Was The Amount Crestar Stood To Gain.

An interpretation of Section 2B4.1, without reference to any other Guideline provision, results in the same conclusion—that the kickbacks paid by the defendant conferred upon Crestar the ability to bill over $129,736,488.54 million in claims that Crestar stood to collect if Medicare, Medicaid, and United Healthcare paid every dollar of those claims. The plain language of Section

---

[7] "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(B). The Government's burden is to prove the amount of loss by a preponderance of the evidence. In health care fraud cases, proof of the amount fraudulently billed to health care benefit programs is *prima facie* evidence of intended loss. *See United States v. Betro*, 115 F.4th 429, 454 (6th Cir. 2024); *United States v. Martinez*, 588 F.3d 301, 326-27 (6th Cir. 2009).

2B4.1 describes the "improper benefit *to be* conferred." U.S.S.G. § 2B4.1 (emphasis added). The commentary to Section 2B4.1 gives examples of how to determine the "value of the action received in return" for a kickback or bribe. U.S.S.G. § 2B4.1, cmt. Background. One example states:

> If a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he and his confederates won *or stood to gain*. If that amount could not be estimated, the amount of the bribe would be used to determine the appropriate increase in offense level.

*Id.* (emphasis added). The language of 2B4.1 and its commentary suggests that the benefits to be gained are not simply the payments actually made but some opportunity to gain future benefit. The text of the Guideline states that the value is what is to be conferred in the future, or what can be collected. Similarly, the example in the commentary speaks of what a defendant stood to collect from a bribe or kickback.

Here, the kickbacks paid by defendant gave Crestar, singularly owned and controlled by defendant, the opportunity to bill for and potentially collect over $129 million in claims. That there were intervening factors—like a payment suspension by Medicare or Medicare's unwillingness to pay the full amount billed—does not change that the kickbacks gave the defendant the opportunity to receive more money. Crestar stood to gain the full amount of the claims as a result of the kickbacks paid to marketers in exchange for referrals. Crestar receiving less than the full amount is the same as the gambler who stood to gain $1 million on his basketball bet but who had his scheme to shave points foiled by a last second three-point shot by a player who was unaware of the scheme. In that example, the value conferred was still $1 million. Accordingly, here, the value conferred is still $129,736,488.54. PSR ¶ 72.

> C. *The Net Value Of The Improper Benefit To Be Conferred Is The Same As The Amount Billed To Medicare Because All Of The Tests Were Medically Unnecessary And The Results Were Unreliable.*

While the amounts Crestar billed as a result of the purchased referrals establish the value of the improper benefit conferred, evidence adduced at trial established that Medicare would not have paid for any of the claims for the laboratory tests billed by Crestar. Setting aside that Medicare does not pay for items or services that were ordered based on the payment or receipt of kickbacks,[8] the tests were not medically necessary. As demonstrated at trial, the defendant knew that the ordering doctors were not the treating physicians of the patients, as required by the laboratory reimbursement rules of Medicare and Medicaid. The defendant also knew about issues with the results of the tests. Many of the individuals were misled about the nature and costs of the test and did not provide true informed consent. *See* Testimony of Claudia Orr; Testimony of Evelyn Howard; Testimony of Wendy Gardner; Testimony of Narena Gregory; Testimony of Marlene Wynn; Testimony of Terry Jackson. Many patients did not receive their results, and when they did, it was months later. *See* Testimony of Claudia Orr; Testimony of Evelyn Howard; Testimony of Wendy Gardner; Testimony of Narena Gregory; Gov. Exh. 181; Testimony of Terry Jackson; Testimony of Marlene Wynn. Those beneficiaries who were fortunate enough to get their results never had a doctor (or genetic counselor) contact them. *See* Testimony of Claudia Orr; Testimony

---

[8] Some courts have held that paying or receiving kickbacks, on its own, can be a basis for a conviction of health care fraud. In *United States v. Medina*, the Eleventh Circuit held that a defendant may be guilty of health care fraud for submitting prescription claims to Medicare that were tainted by kickbacks, because the defendant submitted the claims after signing a provider application stating that she would follow Medicare's rules and regulations, and thus made a knowing fraudulent representation to Medicare. 485 F.3d 1291, 1297-98 (11th Cir. 2007). Like in *Medina*, here there was testimony that Medicare would not have paid the claim had it known of the kickback. *See id.*; Testimony of Stephen Quindoza. Moreover, the defendant was repeatedly warned by witnesses that he paid illegal kickbacks. *See* Testimony of Jennifer Vilott Morris; Testimony of Denise Trotta.

8

of Evelyn Howard; Testimony of Wendy Gardner; Testimony of Narena Gregory; Testimony of Terry Jackson; Testimony of Marlene Wynn.

As the trial testimony made clear, defendant knew that doctors were paid to merely rubberstamp orders. He also knew that some marketing companies paid patients for their genetic material. *See* Testimony of Alan Richardson and Edward Burch; Testimony of Terry Jackson. He also knew the marketers paid telemedicine companies for the signed orders, and he personally recruited telemedicine companies based on the speed and volume of signed orders. *See* Testimony of Lisa Chastain; Testimony of Dakota White; Testimony of Edward Klapp; Testimony of James Simmons; Testimony of Antonio Gousgounis; Testimony of Erik Santos.

That the jury acquitted the defendant of conspiracy to commit health care fraud and the counts of health care fraud is irrelevant to the question of whether any of the claims were reimbursable. There was no dispute at trial that every cancer genetic test referred to Crestar from the marketers had a requisition order from a doctor that was not treating the beneficiary. Accordingly, each test did not comport with the diagnostic rule in the C.F.R. and was not "reasonable and necessary." *See* Gov. Exh. 370 (citing 42 C.F.R. § 410.32). If the jury concluded that defendant lacked the intent to defraud because of his good faith belief that what he did was not illegal, the tests still lacked medical necessity.

Additionally, there was no value to any of the tests performed because, as the evidence showed, the way in which the tests were collected, the way they were run, and the way results were disseminated meant that each test lacked any reliability. A test result that is not the result of reliable scientific and medical methods has no value. The evidence at trial established that the tests the defendant collected were done door-to-door by non-medical professionals, at senior fairs, and even on street corners. *See* Gov. Exh. 207 (video of collection on street corner in exchange for cash).

9

The tests were bagged in a non-temperature-controlled way, were sent or delivered by marketers, and then sent directly to one of the Crestar lab locations without a corresponding doctor order. In at least one instance, the defendant directed a lab employee to pick up a duffle bag full of samples from the car trunk of a marketer in a parking lot. The doctor order then came separately from a telemedicine company and everything was put together as part of the accessioning process. In another instance, the defendant demanded samples from marketers that had been collected months earlier—samples the defendant knew were induced through direct payments to beneficiaries—and had been sitting in the possession of marketers for months. *See* Testimony of Robert Alan Richardson; Testimony of Edward Burch.

This process lacked appropriately reliable methods to ensure the sample was medically sound or that the sample actually matched the paperwork that came to the lab separately from the myriad of marketers. Crestar, itself, never ran a single genetic test. Instead, each test was then sent out to a reference lab, and the results were returned on the Laboratory Information Management System (LIMS). Most of the results simply stayed there because neither the marketing companies nor the doctors got the results from the system to give them to the patients. And nobody at Crestar made any attempt to make sure beneficiaries got their results. Thus, even assuming the results were for the right patient, most beneficiaries never received any results from the test and could not do anything with those results. This lack of chain of custody in the handling of the samples presents a separate reason why none of the tests were for legitimate medical services. Given the defendant's knowledge of how samples were collected and handled, he should have declined to accept them due to lack of reliability.

Because each test lacked medical necessity and was not for a legitimate service, there was no value of the test to Medicare and an offset as to loss calculation would not apply. *See United*

10

Case 3:21-cr-00171   Document 625   Filed 06/19/25   Page 10 of 14 PageID #: 6526

*States v. Mehmood*, No. 19-1243, 2021 WL 2979591, at *6 (6th Cir. July 15, 2021) (Mehmood II) (affirming district court finding on remand for intended loss that fraud was pervasive and services were not legitimate); *cf. United States v. Mehmood*, 742 F. App'x 928, 941 (6th Cir. 2018) (Mehmood I) (finding "the value of any *legitimate* clams, if established, must be offset against the aggregate billings" (emphasis in original)); *United States v. Anders*, 333 F. App'x 950, 954-55 (6th Cir. 2009) (requiring credit against loss for value of services rendered); s*ee United States v. Bolos*, 104 F.4th 562, 571, 576-77 (6th Cir. 2024) (finding that all claims were false without offset where entire business model was based on doctors ordering prescriptions without a doctor-patient relationship).[9] Instead, the defendant is responsible for the entire amount conferred on Crestar as a result of the referrals he purchased through kickbacks. Even if defendant was not the marketer who coerced patients, or the marketer who paid the telemedicine companies and doctors for their orders, as the owner of the laboratories and orchestrater of the entire scheme, it was not only reasonably foreseeable, but it was a near absolute certainty that the chain of kickbacks for referrals

---

[9] Although entirely unclear in the Sixth Circuit, to the extent the analysis of § 2B4.1 is a question of reduction in the "value of the benefit," rather than as "offset" to loss, no reduction of the value for "direct costs" is appropriate here, particularly where the entire goods or services resulting from the kickback scheme lacked any medical value. The notion of calculating "net value" comes from the cross reference in § 2B4.1 to § 2C1.1 cmt. n.3. The meaning of net value, as defined in § 2C1.1 cmt. n.3, does not equate to net profits. *United States v. Shah*, 95 F.4th 328, 382, 385-86 (5th Cir. 2024); *see also United States v. Landers*, 68 F.3d 882, 885 (5th Cir. 1995). Where courts have found it appropriate to deduct "direct costs" from the value, general overhead costs are not deducted. *See Shah*, 95 F.4th at 385-86 (deducting some direct surgery costs where no allegation that the surgeries were not performed or were not medically necessary, but did not deduct overhead costs). Like the services in *Bolos*, the services here lacked any medical necessity, and in addition, lacked medical value or reliability, and therefore no reduction should be assessed under a "net value" analysis. Even if a reduction of the value of the benefit conferred were appropriate here, there is not evidence for the defendant to establish more than $10 million in direct costs to lower the offense level under U.S.S.G. § 2B1.1(b)(1) as proposed in the PSR. There certainly is not evidence of over $60 million of direct costs, which would be required to lower the offense level that the United States asserts is appropriate here. It would be the defendant's burden to prove these direct costs.

for genetic tests would result in Crestar billing Medicare and Medicaid for those tests and collect payment. In fact, it was the goal of the defendant to obtain as much money as possible from Medicare and Medicaid through inducing referrals by paying kickbacks to the marketers. In any event, participants in a conspiracy are held responsible for the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); *see also Kallen-Zury,* 629 F. App'x at 913; *Job*, 387 F. App'x at 458 (finding government met its burden and stating, "Government need only show it was reasonably foreseeable to [defendant] that recipients were fraudulently being prescribed wheelchairs"); *United States v. Aguera*, 281 F. App'x 893, 894-95 (11th Cir. 2008) (evidence that a patient recruiter contributed a significant number of patients to a kickback scheme, recruited accomplices, and saw the extensive list of participants in the kickback logbook, made him responsible for the entire loss amount in a kickback conspiracy). Here, the reasonably foreseeable amount is either what Crestar billed or what it was paid. For the reasons stated above, the United States submits that the $129,736,488.54 Crestar billed Medicare, Medicaid, and United Healthcare is the correct determination of the value of the benefit conferred. No offset of this amount is necessary because there was no value to the patients where all the tests were medically unnecessary and lacked reliability and where all the costs associated with running those tests, and Crestar's business in general, were outlays made to further Crestar's fraudulent business.

Respectfully submitted,

ROBERT E. MCGUIRE
Acting United States Attorney
Middle District of Tennessee

By: */s/ Sarah K. Bogni*
SARAH K. BOGNI
ROBERT S. LEVINE
Assistant United States Attorneys
United States Attorney's Office
719 Church Street, Suite 3300
Nashville, TN  37203
Telephone: (615) 736-5151

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2025, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF and that a copy will be sent to defense counsel of record for each defendant, via CM/ECF.

                                              */s/ Sarah K. Bogni*
                                              SARAH K. BOGNI
                                              Assistant United States Attorney